UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__4/2/2021__
```

-----------------------------------------------------------------------X
                                                   :

RACHAEL MANCUSO,                        :
                                                     :

                Plaintiff,          :

                                                    :               21-cv-00989 (LJL)

     -v-                        :

                                                     :           OPINION AND ORDER

L'OREAL USA, INC., et al.,           :
                                                   :

               Defendants.        :
                                                     :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       Defendants L'Oreal USA, Inc. ("L'Oreal") and IT Cosmetics, LLC ("IT Cosmetics," and together with L'Oreal, "Defendants") move, pursuant to Federal Rule Civil Procedure 12(b)(6) to dismiss the complaint against them for failure to state a claim for relief. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

       The plaintiff in this action, Racheal Mancuso ("Plaintiff" or "Mancuso") was an employee of IT Cosmetics which, in 2016, became a subsidiary of L'Oreal. Dkt. No. 1 ("Complaint" or "Compl.") ¶¶ 8, 11. She was hired by IT Cosmetics in November 2013 on an at-will basis as its Senior Manager of Home Shopping. *Id.* ¶ 8. When Plaintiff began her employment with IT Cosmetics she signed a Non-Competition and Confidentiality Agreement, dated November 21, 2013 (the "NCA") that contained a restrictive covenant prohibiting her from engaging in a business that was competitive with the business of IT Cosmetics for two years in the event that she separated from it. *Id.* ¶ 10. After L'Oreal acquired IT Cosmetics, Mancuso signed an Employee Retention Agreement with L'Oreal, dated December 18, 2017 (the "Retention Agreement"), which was designed to incentivize her to continue her employment

with L'Oreal through December 2019.  *Id.* ¶ 12.  Mancuso performed her obligations under the

Retention Agreement in full until her resignation in 2020.  She provided two weeks advance

notice of her resignation on January 17, 2020, ¶ 20, and resigned from the L'Oreal on January

31, 2020, to pursue her own consulting business.  *Id.* ¶¶ 18-91.

     After Mancuso announced her resignation, L'Oreal offered her an opportunity to consult

for L'Oreal.  *Id.* ¶ 21.  Mancuso alleges she "agreed to a non-exclusive arrangement and

proposed that she would provide services to the [L'Oreal] for ten (10) days each month, in

exchange for a consulting fee."  *Id.* ¶ 21.  Thereafter, Plaintiff alleges L'Oreal "offered [Plaintiff]

a consulting fee that was half (1/2) the amount that was paid to a non-exclusive male-consultant

performing at a substantially equivalent level."  *Id.* ¶ 22.  Plaintiff then "brought to the attention"

of L'Oreal that it had "offered her materially less in the form of consulting fee than was currently

paid to its male consultant."  *Id.* ¶ 23.

     Meanwhile, Mancuso also signed a contract and accompanying Statement of Work

("SOW") with another company, Glamsquad, allegedly in the same industry as L'Oreal.  *Id.*

¶ 25.  The contract and SOW set Mancuso up as an independent contractor to Glamsquad.  It

required Mancuso to provide services to Glamsquad as set forth in each SOW accepted by

Mancuso for the fees set forth in each SOW.  The SOW Mancuso signed with her contract gave

her the opportunity to provide brand development strategy to Glamsquad for approximately

80-100 hours per month (with any work above 80 hours per month to be pre-approved by

Glamsquad) at a rate of $175 per hour.  Dkt. No. 21-3.  L'Oreal initially objected to Mancuso's

contract with Glamsquad, taking the position it was a competitor and that "we do need to enforce

your non-compete."  Compl. ¶ 27; Dkt. No. 21-4.  On February 10, 2020, L'Oreal wrote in an

email to Plaintiff:

> [W]e have made the decision to enforce your non-compete for a period of twelve (12) months.  This is a reduction from the two (2) year period set forth in your agreement.  You will continue to receive your base pay during the period of enforcement, and if you are on L'Oreal healthcare benefits, you may continue your previous elections.

Dkt. No. 21-4 (the "Separation Agreement").  In the same communication, L'Oreal withdrew its offer to Mancuso for her to consult for L'Oreal.  *Id.*

Plaintiff "accepted" the terms of the Separation Agreement and "rescinded" her agreement to consult with Glamsquad.  Compl. ¶ 40.  Subsequently, L'Oreal "failed to pay [Plaintiff's] first salary continuation when due on February 29, 2020, per the [terms of the Separation Agreement]."  *Id.*  Plaintiff then "escalated the matter and sought the issuance of her salary continuation payment by special payroll on March 6, 2020."  *Id.* ¶ 42.  The next business day, March 9, 2020, L'Oreal issued a one-page letter to Plaintiff stating that it had "made the decision not to no [sic] longer enforce" the NCA as to Glamsquad after "review of the specific details relating to your new role."  Dkt. No. 21-5.  At the same time, L'Oreal demanded that Plaintiff inform L'Oreal of any change she made in "employers or positions on or before March 1, 2021 . . . with advance written notice containing the name of your new employer and a description of your expected job duties, so that we may determine whether or not your [NCA] has been triggered."  *Id.*  It stated that if, and only if, L'Oreal made the determination to trigger the NCA would Mancuso be reinstated to payroll and even then, only "during any period in which we enforce your [NCA]."  *Id.*

Thereafter Plaintiff received no payment or benefits from L'Oreal.  Compl. ¶ 47.  Plaintiff alleges that Defendants breached the Separation Agreement by failing to continue to pay her salary and benefits.  She also alleges that by rescinding her agreement with Glamsquad, she lost "the valuable fees and opportunities to pursue her consulting business represented" by that agreement.  *Id.* ¶ 37.

## PROCEDURAL HISTORY

Mancuso filed this complaint in the United States District Court for the District of New Jersey on May 8, 2020. Dkt. No. 1. She asserts claims for breach of contract, promissory estoppel, breach of the duty of good faith and fair dealing, tortious interference with prospective economic relations, and violations of the New Jersey Wage Payment Law, N.J.S.A. § 34:11-2 *et seq*., and Contentious Employee Protection Act, N.J.S.A. §§ 34:19-1, *et seq*. On February 1, 2021, the District Court for the District of New Jersey granted Defendants' motion for a transfer of venue pursuant to 28 U.S.C. § 1404, concluding that Mancuso was bound by the forum selection clause contained in the NCA, that the Separation Agreement was not an independent agreement but an amendment of the NCA, and that Plaintiff's claims were covered by the forum selection clause. *See* Dkt. No. 13. On February 16, 2021, Defendants filed a motion to dismiss. Dkt. No. 19. Plaintiff responded on March 2, 2021, Dkt. No. 22, and Defendants replied on March 9, 2021, Dkt. No. 24.

## DISCUSSION

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a

4

plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

### A.    Breach of Contract

Under New York law, which governs Plaintiff's common law claims, "there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996)).

Defendants do not dispute that the Separation Agreement is a valid enforceable agreement, supported by consideration and binding on them.  They argue that they were not in breach of the Separation Agreement because they ultimately chose not to enforce the Settlement Agreement as to Mancuso's employment by Glamsquad.  They focus on the statement in the Settlement Agreement that Mancuso would "continue to receive [her] base pay during the period of enforcement."  Dkt. No. 21-4.  Defendants argue that because L'Oreal relieved Mancuso of the confidentiality obligations and permitted her to take on the assignment with Glamsquad, they were relieved of the obligation to pay salary and benefits.

On a motion to dismiss a breach of contract claim under Rule 12(b)(6), the court must "resolve any contractual ambiguities in favor of the plaintiff."  *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015) (quotation marks and citation omitted).  Thus, dismissal not appropriate when a contract is ambiguous and Plaintiff

has "an arguable claim under the contract." *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017).

The language at issue in the Separation Agreement tends to favor Mancuso; the best that can be said for Defendants is that it may be ambiguous.  The critical question is what is meant by the "period of enforcement" in the sentence where Defendants agree to continue Mancuso's base pay "during the period of enforcement."  Dkt. No. 21-4.  Plaintiff argues forcefully that the language is a reference to the sentences that immediately precede it.  In those preceding sentences, Defendants state: "we have made the decision to enforce your non-compete for a period of twelve (12) months.  This is a reduction from the two (2) year period set forth in the agreement."  *Id*. (emphasis added).  Plaintiff argues that the language "the period of enforcement" in the subsequent sentence refers to the "period of twelve (12) months" referred to in the preceding sentence.

Plaintiff's argument is not only supported by the plain language of the Separation Agreement when read as a whole but also by its evident purpose.  L'Oreal did not agree to provide Plaintiff severance only in the event that she was offered a competitive position which she could not contractually accept.  Nor have Defendants presented any business logic for why Plaintiff would have agreed to a provision that would have required her to hunt out jobs which she would be prevented from taking in order to receive the benefit to which she was entitled under the Separation Agreement.  Such an interpretation would work to the detriment of both Defendants and Plaintiff—hurting Defendants by incenting Plaintiff to offer her services to others whom she knew competed with Defendants (and thus presenting the risk that confidential information might be conveyed), and hurting Plaintiff by requiring her to waste her time and that of prospective employers simply to entitle her to severance pay from Defendants.  The intent of

the Separation Agreement was to prevent Mancuso from working for any employers whom

L'Oreal deemed to be competitors.  Thus, L'Oreal's decision not to enforce the Separation

Agreement as to Glamsquad did not relieve Mancuso of her obligations under the Separation

Agreement or deprive her of her right to pay and benefits for the 12-month period.  Plaintiff

remained under an obligation not to solicit and accept a job offer that L'Oreal considered to be

competitive.  Indeed, accepting Defendants' theory of the Separation Agreement, not only would

Plaintiff only be entitled to severance if she sought out and received a competitive job offer, but

Defendants would be required to pay severance only during any period in which Plaintiff had an

open offer of alternative employment.  After Plaintiff turned down any such offer, Defendants

could revert to "no longer" enforcing the agreement and cease any payments—while at the same

time requiring Plaintiff to keep Defendants appraised of any further offers so they could

"determine whether or not [the NCA] has been triggered."  Dkt. No. 21-5.

The Court need not determine whether the Severance Agreement is clear and

unambiguous in Plaintiff's favor.  Plaintiff has not moved for judgment.  It is sufficient that

Defendants have offered no compelling response to Plaintiff's arguments at this stage of the

litigation.  The issue certainly cannot be resolved in Defendants' favor on the pleadings.  *See

Luitpold Pharm.*, 784 F.3d at 86.  Accordingly, dismissal is not appropriate.

### B.     Promissory Estoppel

Plaintiff claims, in the alternative, that if Defendants' conduct does not constitute a

breach of contract, Defendants are liable in promissory estoppel.  "Promissory estoppel requires

a plaintiff to prove three elements: (1) a clear and unambiguous promise, (2) reasonable and

foreseeable reliance by the promisee, and (3) unconscionable injury to the relying party as a

result of the reliance."  *Aleem v. Experience Hendrix, L.L.C.*, 413 F. Supp. 3d 251, 259

(S.D.N.Y. 2019) (quotation marks and citation omitted); *see Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996)).

"[Q]uasi-contractual claims are generally precluded where valid, enforceable contracts governing the particular subject matter of the case exist between the parties." *Shetel Indus. LLC v. Adin Dental Implant Sys., Inc.*, 2020 WL 5820599, at *35 (E.D.N.Y. Sept. 30, 2020) (citing *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006)); *see A. Montilli Plumbing & Heating Corp. v. Valentino*, 935 N.Y.S.2d 647, 648 (2d Dep't 2011) ("The existence of an express agreement, whether oral or written, governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter."). An exception exists where "a bona fide dispute exists as to the existence of the contract," in which case "a plaintiff may proceed on both breach of contract and quasi-contract theories" in the alternative. *Shetel Indus. LLC*, 2020 WL 5820599, at *35 (quoting *Nakamura v. Fujii*, 677 N.Y.S.2d 113, 116 (1st Dep't 1998)); *see Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007) ("When there is a bona fide dispute as to the existence of a contract . . . assertion of a breach of contract claim does not preclude [plaintiff] from pleading an unjust enrichment claim in the alternative."). A plaintiff may also proceed with a breach of contract claim as well as an independent quasi-contract claim "where the contract does not cover the dispute in issue" on the plaintiff's quasi-contract theory. *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) (quoting *Am. Tel. & Util. Consultants v. Beth Isr. Med. Ctr.*, 763 N.Y.S.2d 466, 466 (1st Dep't 2003)); *see Underdog Trucking, LLC, Reggie Anders v. Verizon Servs. Corp.*, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010) ("Where a plaintiff also alleges breach of a contract, a promissory estoppel claim is duplicative of a breach of contract claim unless the plaintiff alleges that the defendant had a duty

independent from any arising out of the contract.") (citing *Celle v. Barclays Bank P.L.C.*, 851 N.Y.S.2d 500, 501 (1st Dep't 2008)).

Neither of these exceptions applies here. Defendants have stipulated that the Separation Agreement is a binding contract; the only dispute is its meaning and whether Defendants violated it. *See* Dkt. No. 24at 3 ("[N]either Mancuso nor L'Oreal disputes that the email exchange creating the [Separation Agreement] is a binding contract.").[1] Nor has Plaintiff alleged that Defendants had any duty not spelled out in the Separation Agreement itself. The promise on which Plaintiff alleges having relied is payment of salary and benefits for 12 months. That promise was conveyed in the same email that Defendants agree constitutes a valid and enforceable contract. Plaintiff's promissory estoppel claim is therefore duplicative of her breach of contract claim and must be dismissed.

## C.    Breach of Covenant of Good Faith and Fair Dealing

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see Marcus v. W2007 Grace Acquisition I, Inc.*, 203 F. Supp. 3d 332, 340 (S.D.N.Y. 2016) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract.") (quoting *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)). Thus, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44

---

[1] At oral argument on March 29, 2021, Defendants stipulated that the Separation Agreement, standing on its own, was a binding enforceable contract against them.

(S.D.N.Y. 1997); *see Ret. Bd. of Policemen's Annuity & Ben. Fund of City of Chi. v. Bank of N. Y. Mellon*, 2014 WL 3858469, at *3 (S.D.N.Y. July 30, 2014) ("[C]ourts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing where the claims derive from the same set of facts.") (internal quotation marks and citation omitted).

Such is the case here.  Plaintiff's claim for breach of the covenant of good faith and fair dealing rests on the same factual allegations as her claim for breach of contract.  Moreover, bad faith in entering into a contract is not enough to trigger the duty of good faith and fair dealing, since "the obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract."  *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002) (citation omitted).  Accordingly, Plaintiff's claim for breach of the covenant of good faith and fair dealing is dismissed as redundant.

## D.     Tortious interference

Plaintiff's claim for tortious interference must be dismissed because she has not pled that Defendants' actions induced or caused any third party to either breach a contract or decline to enter into a business relationship with Plaintiff.  Plaintiff alleges only that she *herself* "rescinded" her agreement to consult with Glamsquad after "accept[ing]" the terms of the Separation Agreement.  Compl. ¶ 40.  Although Plaintiff alleges that she declined to enter into a consulting engagement with Glamsquad in reliance on L'Oreal's representations in the Separation Agreement, such does not suffice to create a tortious interference claim, which requires some action by a defendant toward the third party.

"The tort of inducement of breach of contract, now more broadly known as interference with contractual relations, consists of four elements: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional

inducement *of the third party* to breach or otherwise render performance impossible; and (4) damages to plaintiff." *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 520 (S.D.N.Y. 2011) (quoting *Kronos, Inc. v. AVX Corp.*, 595 N.Y.S.2d 931, 934 (1993)) (emphasis added).  Here there is no allegation that any Defendant induced Glamsquad to breach its contract with Mancuso, nor indeed that Glamsquad breached such contract or even exercised an option not to hire Plaintiff.

Similarly, a claim for tortious interference with a prospective contract requires "a showing that: '(1) [plaintiff] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'" *Id.* (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400–02 (2d Cir. 2006)).  However, "the defendant's interference must be direct," i.e., "[t]he defendant must target some activities *toward the third party and convince the third party* not to enter into a business relationship with the plaintiff." *Id.* (citing *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)) (emphasis added).

Under either theory, Plaintiff's failure to allege that L'Oreal's conduct caused or induced *Glamsquad*—as opposed to Plaintiff—to take any action with respect to a contract or prospective business relationship is fatal to Plaintiff's claim for tortious interference.  *See Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 404-05 (S.D.N.Y. 2012) (dismissing a claim for tortious interference with contract where the plaintiff did not "allege that [d]efendants took any action toward third parties with which [the plaintiff] had contracts" and plaintiff did not "allege that any third party breached its contract, but instead alleged that *[p]laintiff* breached its contracts with third parties as a result of alleged breach of its contract with plaintiff") (emphasis

added) (collecting cases); *Fonar*, 957 F. Supp. at 481 ("In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of contract by the other party.") (quoting *Jack L. Inselman & Co. v. FNB Fin. Co.*, 396 N.Y.S.2d 347, 349 (1977)); *Brown Media Corp. v. K & L Gates, LLP*, 586 B.R. 508, 530 (Bankr. E.D.N.Y. 2018) ("As federal courts applying New York law have recognized, conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.") (quoting *Carvel Corp. v. Noonan*, 785 N.Y.S.2d 359, 363 (2004) (collecting cases)).  Thus Plaintiff's tortious interference claim must be dismissed.

### E.   New Jersey Wage Payment Law

The New Jersey Wage Payment Law, N.J.S.A. § 34:11-2 *et seq.* ("NJWPL") provides, inter alia, that "every employer shall pay the full amount of wages due to his employees at least twice during each calendar month," *id.* § 34:11-4.2, and that "[n]o employer may withhold or divert any portion of an employee's wages" unless employer is "required or empowered to do so by New Jersey or United States law" or the wages are withheld or diverted for purposes specifically permitted by the statute, none of which applies here, *id.* § 34:11-4.4.

Defendants argue that Plaintiff's NJWPL claim must be dismissed because she did not work or reside in New Jersey in the relevant time period.  Mancuso alleges that she is a resident of South Dakota, that she "reported" to L'Oreal and IT Cosmetics's "New Jersey Location" and that she had "periodic in-person meetings in Jersey City."  Compl. ¶¶ 2, 7, 15.  She does not allege that she worked in New Jersey except for the periodic meetings.  According to the Complaint, Plaintiff's presence in South Dakota was not temporary or transient; it was her visits to New Jersey that were episodic.

"The plain language of the [NJWPL] is not definitive as to its extraterritorial application."  *Redick v. E Mortg. Mgmt., LLC*, 2013 WL 1089710, at *8 (D. Del. Mar. 15, 2013); *report and recommendation adopted*, 2013 WL 5461616 (D. Del. Sept. 30, 2013); *see id.*, at *8-9 (analyzing the definitions of employer and employee under the NJWPL and describing the ambiguity as to extraterritorial application); *accord Vengurlekar v. Silverline Techs., Ltd.*, 220 F.R.D. 222, 231 n.9 (S.D.N.Y. 2003) ("The interplay of the[] two definitions [of 'employer' and 'employee' in the NJWPL] fails to explain where an employee must reside or work in order to invoke the New Jersey statute.").[2]  Nor have New Jersey courts definitively addressed this question.  *See Redick*, 2013 WL 1089710, at *10 ("New Jersey courts have not expressly stated that New Jersey Wage Law cannot apply to the work of out-of-state employees."); *see also Ortiz v. Goya Foods, Inc.*, 2020 WL 1650577, at *3 (D.N.J. Apr. 3, 2020).

However, the weight of authority in New Jersey and federal courts supports the conclusion that the law does not apply to employees who reside and work outside of the state of New Jersey.  *See Ortiz*, 2020 WL 1650577, at *3 ("While the New Jersey Supreme Court has not published a decision definitively resolving whether the NJWPL affords relief to out-of-state employees of New Jersey-based companies, the decisions of lower courts have suggested that it does not."); *id.* at *2 ("Decisions by other courts in the District of New Jersey that have addressed the reach of NJWPL support" the argument that NJWPL "provides protections for employees based in New Jersey, not those who live and work elsewhere"); *Redick*, 2013 WL 1089710, at *12 ("Taken together, the text of portions of the New Jersey Wage Law, the guidance provided by New Jersey state courts, the opinions of legal commentators and the

---

[2] NJWPL defines the term "employee" as "any person suffered or permitted to work by an employer . . ."  N.J.S.A. § 34:11–4.1.  The term "employer" is defined as any corporation, etc., "employing any person in this State."  *Id*; *see Vengurlekar*, 220 F.R.D. at 231 n.9.

decisions of federal courts interpreting the Law all tend to point in one direction—they suggest that the Law is only applicable to those working within New Jersey's geographical boundaries.").  Indeed, with one arguable exception,[3] every district court that this Court is aware of having considered the question has ruled that the NJWPL does not cover individuals who do not work or reside in the state of New Jersey, even if their employer is based there.  *See, e.g., Ortiz*, 2020 WL 1650577, at *2-*5 (dismissing an NJWPL claim on the pleadings where the plaintiff "did not allege that Ortiz either live[d] or work[ed] in New Jersey," and only alleged that he was "a sales representative for [the defendant] 'at' its Jersey City headquarters"— although his sales territory was exclusively outside of New Jersey—and that as a sales representative he was "required to attend periodic meetings in New Jersey"); *Lupian v. Joseph Cory Holding, LLC*, 240 F. Supp. 3d 309, 313-14 (D.N.J. 2017), *aff'd on other grounds by* 905 F.3d 127 (3d Cir. 2018) (observing that "[t]he few courts that have considered the issue have all held 'that the NJWPL does not apply to employees based outside of New Jersey'" and holding the same) (citation omitted); *Overton v. Sanofi–Aventis U.S., LLC*, 2014 WL 5410653, at *5-*6 (D.N.J. Oct. 23, 2014) (dismissing NJWPL claims where plaintiffs lived and worked outside of New Jersey but attended training in New Jersey, were supervised from New Jersey, and were issued credentials and business cards reflecting that they were New Jersey employees); *Vengurlekar*, 220 F.R.D. at 231 (declining to certify a putative class of employees of a New Jersey-based employer where not all class members worked in New Jersey); *see also Redick*, 2013 WL 1089710, at *8-*12.

In *Vengurlekar*, a court in this district, after noting the indeterminacy of the statutory language of the NJWPL, persuasively articulated:

---

[3] *Portillo v. Nat'l Freight, Inc.*, 323 F. Supp. 3d 646, 663 (D.N.J. 2018), discussed *infra* at n.5.

> New Jersey may . . . have an interest in policing those corporations headquartered within its borders and ensuring that such corporations compensate their employees, no matter where the employees live or work.  But it is the legislative purpose that is most important in determining a statute's scope.  And the purpose of the NJWPL is primarily to protect employees.

220 F.R.D. at 231 (citing *Mulford v. Computer Leasing, Inc.*, 759 A.2d 887, 891 (N.J. Super. Ct. Law Div. 1999)); *see Mulford*, 759 A.2d at 891 ("Employees are the obvious special beneficiaries of the statute."); *see also Winslow v. Corporate Express, Inc.*, 834 A.2d 1037, 1043 (N.J. Super. Ct. App. Div. 2003)) (quoting *Mulford*, 759 A.2d at 891).

The conclusion that the applicability of the NJWPL depends on the location of the employee, and not the employer, is supported by *Mulford*, in which the New Jersey Superior Court, Law Division held that the NJWPL *did* apply to a New York corporation doing business in New Jersey where the employee plaintiffs were "based in, and work out of New Jersey . . . [and were] residents of [the] state." 759 A.2d at 891.   The court held that those "circumstances, and the strong public and statutory policy of [New Jersey] in favor of protecting payment of employees' duly earned compensation, dictate the application of New Jersey law" as to those plaintiffs.  *Id.*; *see Redick*, 2013 WL 1089710, at *10 ("Legal commentators have . . . construed the holding in *Mulford* to mean that the New Jersey Wage Law applies to 'employees working in New Jersey' and that it is '*[t]he location of the employment*, not the location of the employer, [that] governs the employee wage payment law that applies.'") (quoting 18 Marvin M. Goldstein & Stanley L. Goodman, New Jersey Practice Series: Employment Law § 6.1 & n. 2 (2d ed. 2011)).

This conclusion also draws support from dicta in an opinion by the New Jersey Appellate Division expressing doubt that an out-of-state plaintiff could assert a claim under the NJWPL against an employer headquartered in New Jersey and suggesting the answer may depend upon where plaintiff performed his work.  *See Winslow*, 834 A.2d at 1041 n.2 ("Because Plaintiff's

office was located in Delaware, there may be a question whether the [NJWPL] governed his

employment . . . [m]oreover the record does not indicate where plaintiff performed his services

as a sales representative, which may be relevant to a determination of the applicability of New

Jersey law.").

Finally, the conclusion is also supported by New Jersey's "well-established public policy

against governing out of state conduct." *Ortiz*, 2020 WL 1650577, at *4 (citing *D'Agostino v.

Johnson & Johnson*, Inc., 628 A.2d at 318 (N.J. 1993)); *see D'Agostino*, 628 A.2d at 318 ("New

Jersey law does not regulate conduct outside the state.  Rather, New Jersey law regulates conduct

in New Jersey."); *see also Redick*, 2013 WL 1089710, at *11; *Lupian*, 240 F. Supp. 3d at 313.

The Court thus adopts the reasoning of the numerous courts that have concluded that the

NJWPL does not encompass claims by out-of-state employees.  This conclusion is supported by

the specific legislative purpose of the NJWPL, which is "primarily to protect employees,"

*Vengurlekar*, 220 F.R.D. at 231 (citation omitted), and by the more general public policy against

extraterritorial application of New Jersey law.[4]  Although Plaintiff may have "reported" to an

---

[4] The only case Plaintiff cites that arguably reached a different conclusion, *Portillo*, 323 F. Supp. 3d at 662–63, is distinguishable on the facts.  That case considered whether New Jersey law applied to claims by truckers whose work was "inherently of an interstate nature," where "[n]o [p]laintiff's work was primarily performed in his own state of residence," and where the plaintiffs "did perform a significant portion of their work in New Jersey."  *Id*. at 663.  This motion does not require the Court to address whether a different result would follow where the employee was temporarily in another state or where there was no state other than New Jersey that was plaintiff's state of residence and regular place of employment.  Moreover, in *Portillo*, the court's inquiry was whether a choice of law analysis dictated application of New Jersey law or the law of another state.  That question, however, is distinct from (even if related to) the question of the scope of New Jersey law and whether out-of-state employees have a cause of action under the NJWPL.  *See, e.g., Ortiz*, 2020 WL 1650577, at *4 ("[T]he court need not decide whether this dispute is covered by [a] choice of law provision.  Even assuming that it is, the Court nevertheless concludes that Ortiz fails to state a plausible NJWPL cause of action [because] [t]he available caselaw strongly militates against applying the NJWPL statute to encompass the claims of individuals who work outside of New Jersey, regardless of a contractual choice of law provision.") (citing *Lupian*, 240 F. Supp. 3d at 313-14).

employer in New Jersey and attended periodic meetings there, under the available precedent that is not enough to bring her within the ambit of the NJWPL.  *See, e.g.*, *Ortiz*, 2020 WL 1650577, at *2-*5; *Overton*, 2014 WL 5410653, at *5-6.[5]  The only plausible inference from the Complaint is that Plaintiff resided and worked in South Dakota, and her NJWPL claim must be dismissed.

Even if an out-of-state employee could bring a NJWPL claim, moreover, the instant claim must be dismissed for the independent reason that Plaintiff does not plead that the payments withheld by L'Oreal are "wages" within the meaning of that statute.  The NJWPL prohibits an employer from unlawfully withholding or diverting "wages," which are defined by the statute as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto."  N.J.S.A. § 34:11-4.1(c).[6]  The payments Plaintiff alleges were withheld do not constitute monetary compensation for "labor or services rendered."

By Plaintiff's own account, the Separation Agreement represented an amendment to the NCA.  "Because past consideration is insufficient to support an agreement entered into subsequent to a primary contract, the subsequent agreement 'must be supported by new and

---

[5] Notably, Plaintiff does not allege that she was on a mere temporary hiatus from employment in a New Jersey office.  The Court need not address whether such pleading would rescue her claim.
[6] Plaintiff's opposition brief invokes the definition of "wages" in the New Jersey Wage and Hour Law ("NJWHL"), at N.J.S.A. § 34:11-57, which is a related but distinct statute from the NJWPA, *see Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 457 (2015) (stating that the NJWPL and NJWHL are "complementary statutes": the former "governs the time and mode of payment of wages due to employees" and the latter "is designed to protect employees from unfair wages and excessive hours" by establishing "a minimum wage [and] an overtime rate") (internal quotation marks and citation omitted).  The definition of "wages" in the NJWHL is more expansive and includes "commissions, bonus, piecework compensation and any other benefits arising out of an employment contract."  N.J.S.A. § 34:11-57.

independent consideration.'"  *Perfume Paradise Ltd. v. Lekach*, 2008 WL 11510508, at *2

(D.N.J. Apr. 7, 2008) (quoting *Emerson N.Y.-N.J., Inc. v. Brookwood Television, Inc.*, 300 A.2d

187, 190 (N.J. Super. Ct. Law Div. 1973)); *see Levine v. Blumenthal*, 186 A. 457, 258 (N.J.

1936)).  The payments owed by L'Oreal under the terms of the Separation Agreement are not

consideration for any "services rendered" in the past by Plaintiff to L'Oreal.  N.J.S.A.

§ 34:11-4.1(c).  Defendants discharged their obligations with respect to any past services

rendered.  The payments are consideration exchanged for Plaintiff's obligation *not* to render

services for a competitor going forward and in the future.  *See* Compl. ¶ 1 (by the Separation

Agreement, L'Oreal "promised Ms. Mancuso twelve (12) months of full pay and benefits

continuation, in exchange for Ms. Mancuso's promise to reject the Glamsquad offer").

     Accordingly, Plaintiff fails to state a claim under the plain language of the NJWPL.  *See*

*Moran v. DaVita, Inc.*, 2009 WL 792074, at *18 (D.N.J. Mar. 23, 2009), *vacated in part on other*

*grounds*, 441 F. App'x 942 (3d Cir. 2011) ("'[W]ages' as defined in the Wage Payment Law

were not intended to embrace payments owed to an employee pursuant to a contractual

obligation but not tethered to the performance of services by the employee."); *Dubler v.*

*Hangsterfer's Lab'ys*, 2012 WL 714130, at *7 (D.N.J. Mar. 5, 2012) (granting summary

judgment to the defendant on a NJWPL claim "based on the definition of 'wages' in the WPL"

where plaintiff sought "severance benefits and a year-end bonus payment").[7]

_____

[7] The cases on which Plaintiff relies are inapposite.  *Hersch v. Hersch*, 2017 WL 3198248, at *5
(N.J. Super. Ct. App. Div. July 28, 2017) did not address the definition of wages under the
NJWPL, but addressed whether a marital settlement agreement, which defined compensation
more broadly than the NJWPL, required the defendant to pay alimony out of severance
payments.  Moreover, *Hersh* relied on *Owens v. Press Publ'g Co.*, which held that severance pay
is "terminal compensation measured by the service given during the subsistence of the contract"
and is thus "[i]n a real sense is renumeration for . . . services rendered."  120 A.2d 442, 445 (N.J.
1956).  As described above—even apart from the restrictive definition of "wages" in the
NJWPL—the payments Plaintiff seeks are not renumeration for services rendered in the past.

F.      **Conscientious Employee Protection Act**

Finally, Plaintiff brings a claim for retaliation under the Conscientious Employee

Protection Act, N.J.S.A. §§ 34:19-1, *et seq*., ("CEPA").  CEPA, "commonly known as the

'whistle-blower' statute, prohibits employers from taking retaliatory action against an employee

who (1) discloses or threaten to disclose to a supervisor or public body an employer's wrongful

activity or policy, (2) provides information to or testifies before a public body conducting an

investigation into any violation of law, or (3) objects to or refuses to participate in an activity or

practice which the employee reasonably believes is in violation of law or is incompatible with a

clear mandate of public policy."  *Morro v. DGMB Casino LLC*, 112 F. Supp. 3d 260, 282 (D.N.J.

2015) (citing N.J.S.A. § 34:19–3); *see Blackburn v. United Parcel Serv., Inc.*, 3 F. Supp. 2d 504,

512 (D.N.J. 1998), *aff'd*, 179 F.3d 81 (3d Cir. 1999) ("CEPA was enacted in 1986 to protect

from retaliatory action employees who 'blow the whistle' on employers engaged in illegal or

harmful activity.").

"The familiar burden-shifting framework" that applies to federal retaliation claims

"applies to CEPA retaliation claims" as well: "A plaintiff must establish a *prima facie* case; then

the burden shifts to the employer to provide a legitimate non-retaliatory reason for the adverse

employment action; then the burden shifts back to the plaintiff to demonstrate that the non-

retaliatory reason was pretext for a prohibited reason."  *Est. of Oliva v. New Jersey*, 579 F. Supp.

2d 643, 684 (D.N.J. 2008), *aff'd sub nom. Est. of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d

788 (3d Cir. 2010) (citing *Fleming v. Corr. Healthcare Solutions, Inc.*, 751 A.2d 1035, 1040

---

They are expressly consideration for an obligation not to compete with L'Oreal.  *In re Public
Ledger, Inc.*, 161 F.2d 762, 771 (3d Cir. 1947), on which Plaintiff also relies, similarly does not
address the definition of "wages" under the NJWPL, and also did not contemplate severance pay
offered in exchange for any forward-looking obligation, but characterized severance as "wages"
that were "wholly earned and accrued" before separation.

(2000)).  "To establish a *prima facie* case of retaliation under CEPA, [a] [p]laintiff must establish

(1) [her] reasonable belief that [her] employer's conduct violated a law, rule, or regulation; (2) a

whistle-blowing activity; (3) an adverse employment action; and (4) a causal connection between

her whistle-blowing activity and the adverse employment action."  *Id.* (citing *Caver v. The City

of Trenton*, 420 F.3d 243, 254 (3d Cir. 2005); *see also Dzwonar v. McDevitt*, 828 A.2d 893, 900

(N.J. 2003)).

Plaintiff's CEPA claim fails to make a prima facie case for retaliation because she has not

alleged that she suffered any adverse employment action as an employee of L'Oreal.  Plaintiff's

CEPA claim proceeds on the theory that L'Oreal withdrew its offer for Plaintiff to consult for

L'Oreal, and subsequently reneged on the Separation Agreement, after Plaintiff objected that the

fee L'Oreal had offered was lower than a fee paid to a male consultant with a similar

arrangement.  *See* Compl. ¶¶ 21-27.[8]  The most immediate flaw in this theory, which is fatal to

the claim, is that Plaintiff's complaint and the actions L'Oreal allegedly took in response

occurred only after Plaintiff herself resigned from her position and was no longer in any

employment relationship with L'Oreal.[9]  Prohibited "retaliatory action" is defined under CEPA

as "discharge, suspension or demotion *of an employee*, or other adverse action taken *against an

employee in the terms and conditions of employment*."  N.J.S.A. § 34:19–2(e) (emphasis added);

*see Donelson v. DuPont Chambers Works*, 20 A.3d 384, 392 (N.J. 2011) (quoting N.J.S.A.

§ 34:19–2(e)).  Plaintiff was not an employee of L'Oreal when it made the decisions not to hire

---

[8] Although, notably, the Complaint in fact characterizes L'Oreal's retraction of its offer to hire
Plaintiff as a consultant as a "response" not to Plaintiff's complaint about unequal pay, but to
Plaintiff's disclosure that it had secured a consulting services agreement with Glamsquad.  *See*
Compl. ¶¶ 26-27.
[9] Plaintiff resigned from L'Oreal on January 31, 2020.  Compl. ¶ 19.  She was informed by email
on February 10, 2020 from a L'Oreal human resources executive that Loreal had decided to
"pass on any sort of consulting arrangement."  Dkt. No. 21-4.

her to consult and not to make payments under the Separation Agreement.  For that reason alone,

Plaintiff's CEPA claim must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED IN PART and

DENIED IN PART.  The Clerk of Court is respectfully directed to terminate Dkt. No. 19.


SO ORDERED.

Dated: April 2, 2021
      New York, New York                                    LEWIS J. LIMAN
                                           United States District Judge